All right, counsel, we're ready when you are. Mr. Jones. May it please the court. Good morning, my name is Brantley Jones. I represent the appellants, BLF Land, LLC, and Blaine Larson Farms. About 14 years ago in a You've been counseled throughout? I have. Okay, so you were there when, right? Okay. It's always helpful when we have the lawyer that's kind of been there. Not that I have anything about appellate lawyers, but just when somebody's been on the ground with it, it just helps us to understand this. All right, press ahead. No pun was intended about the ground. So 14 years and about a week ago, the Texas Supreme Court handed down the EAA or Day v. EAA opinion, which solidified the fact that in Texas, landowners own their groundwater in place under the surface, and they analogize that ownership to oil and gas. And the very rights that were at issue in Day are what we're here today about. Now, there's another analogy between that case and this one, and it's that Day was decided at the trial court level on an improper summary judgment, and so too is this case. The district court below granted summary judgment in favor of North Plains, and then also granted its own sua sponte summary judgment motion, thereby disposing of all of our affirmative claims. I want to use my time here today to talk about two of the most salient issues that demand reversal. The first is the district court's improperly expansive reading of a groundwater conservation district's statutory authority, and the other is the district court's weighing of summary judgment evidence, specifically giving weight to one expert over the other. I'll start first with the district's statutory authority, because that issue would likely control all of the rest. So we're here today because of a constellation of regulations passed by the North Plains District that we refer to collectively as the GPU rule. That rule has a production element, and it has a geometric element. The production element is that a landowner is entitled to produce 1.5 acre feet per acre within a GPU. The geometric element is that a GPU can't be more than 1,600 acres, and it can't have diagonal corners more than 25,000 feet apart. So our client owns about 50,000 acres upon which he grows 80% of the potatoes that are grown in the state of Texas. That property has some 44 GPUs declared over it. The district has sought to impose penalties on Larson Farms for exceeding its 1.5 acre feet production limitation in like three to six of its 40-plus GPUs. Now we've challenged that the GPU rule is ultra-virus. It's neither statutorily authorized nor does it meet the limited regulatory purposes for which a district can limit groundwater production. So pursuant to Chapter 36.116 of the Water Code, which is the legislation that provides groundwater districts with their authority to regulate, a district may regulate groundwater production for a limited number of purposes, those being to minimize drawdown, to prevent subsidence, to prevent the degradation of water quality, and to prevent interference between wells. The specific statutory grant here is Chapter 36.116.A.2.B., which provides that a groundwater district may regulate production by limiting the amount of water that may be produced based on acreage or trash size. Not to derail your argument, but you know we read everything, so aren't you honing in on where specifically you say the district court went astray according to you know the arguments that you're making? Yes. But I mean if you want to lay more predicate, go ahead. No, I was actually right there. So the issue here is that the statutory grant allows the district to regulate based on acreage or tract size, whereas this GPU rule, its geometric limitations, regulate the tract size. It regulates the maximum size of a tract within a landowner's acreage. Now here, the district and the district court argue that the ability to regulate tract size is inherent in the ability to regulate based on acreage or tract size, but that's just not grammatically correct and it's not an express authority granted by the water code. May I, let me ask a question. Can you I know this Ground Conservation District encompasses several counties. Is BLF the largest landowner in the counties? I would expect that if it's not the largest, it would be among the five or so largest. And is this GPU regulation applied throughout all the landowners of the district? Yes, it is, Your Honor, but it impacts landowners with more than 1,600 acres more than it would land owners with fewer than 1,600 acres. Because if you have more than 1,600 acres, you end up in a situation where you have to kind of balkanize your property into these, you know. Well, it's weird. I agree. So this isn't, this power isn't expressly granted by the water code, and we know based on the case in South Plains-Lamesa Railroad versus High Plains Groundwater Conservation District that a district cannot exercise authority outside what is expressly given to it. As a special purpose district in Texas, they are constrained in their methods to what is expressly authorized. The power to require these GPUs is not impliedly authorized. It's not necessary to carry out the production or the regulation of production based on acreage or track size. But moving to the issue of the purposes for which the district can regulate, there was competing summary judgment evidence about whether this regulation actually effectuated a purpose as delineated in the water code as a viable purpose or as an allowed purpose. And specifically, the district court found that there was uncontested summary judgment evidence in the form of groundwater drawdown modeling by North Plains' expert that showed some amount of excess drawdown in a few GPUs over an 80-year time horizon. There's several problems with the court's finding there. One, the evidence wasn't uncontested. We had competing summary judgment evidence before the sua sponte summary judgment. We had more summary judgment evidence after. You used the expression competing summary judgment evidence, but how, and you earlier referenced this, that you thought the judge should not have found between the two experts' reports. But how have you shown a genuine dispute of material fact? So, a couple of points here. One, there was no modeling produced by Mr. Oliver, the district's expert. That modeling never made it into his opinions. It wasn't referenced in his 26F report. And as, if you go and look at the testimony itself, which is found in the record at 2694, he was asked in a deposition whether or not he conducted modeling. And he responded that they did that early in the process, but it wasn't making an important point. So, it didn't become part of his opinions and they didn't rely on it. The report itself, which is at record 2447, I believe, only references the district's purpose in enacting the rule as spreading out production. And so, this drawdown finding wasn't really a finding at all. It came from a discussion in a deposition where he says, yeah, we conducted some modeling, but it wasn't making an important point. So, I didn't rely on it. That became the crux of the district court's reasoning behind finding that the GPU rule met a statutory purpose. It also supported the district court's ruling on our substantive due process claim, saying that there was a rational basis because it met this limited statutory purpose of having drawdown. And he also used that same finding in the Penn Central analysis when he said the government, the character of the government action was in favor of North Plains because they had this rule and it met a statutory purpose, which... Let me ask you a question. Could not the district have accomplished the purpose by saying no landowner can draw down more than 1.5 acre feet per whatever it is, 100 acres per year, right? 100 contiguous acres per year. I mean, isn't it your argument that these GPUs are arbitrary and irrational and have no connection to the hydrogeological situation of the Ogallala Aquifer? That is correct. And the GPUs, regardless of their acreage, in the attempt to set a maximum acreage from which you can produce groundwater, we believe that's outside the district's express statutory authority. Now, the code allows districts to regulate based on acreage or tract size, and one, it requires that the rule itself have a hydrogeological purpose. We can test that. But also, it says in doing so, they can look at the contiguous acreage owned by the landowner. So there is an express right to limit those production amounts. And we don't really contest the district's authority to implement a 1.5 acre foot per acre limitation. In fact, we've never used more than 0.107 acre feet per contiguous acreage. Well, extract from all of that, to purge the question, Judge, Barstow asked you, what is the issue you say should have been triable? I heard you say, you know, the other experts didn't mirror each other, et cetera, but, you know, you say you should have a trial, apparently, you know, not the summary judgment. So what's the quintessential tribal issue that the district court missed here? The tribal issue would be... Is it your ultra-virus claim, or is it your due process, both, or what? I mean, just strip to the essential. The essential question, then, is whether Mr. Thornhill, our expert, was correct, that this rule doesn't have any linkage to hydrogeology and doesn't actually effectuate any of the purposes for which a district may regulate. And Mr. Oliver's deposition testimony that said, yeah, we did some modeling, and it showed maybe a 30-foot drawdown over an 80-year time horizon. So that would be the quintessential issue. Does this GPU rule actually have any nexus to hydrogeological reality? Does it meet that 36116E requirement that a rule affecting groundwater production actually bears some semblance of relation to hydrogeological conditions? And as to the other issues in our Penn Central analysis, you know, there's the three-factor test on the economic impact. There was competing expert testimony about the extent of the impact. The district court kicked our case out saying that there wasn't a 42.5% decrease in value. That's not an appropriate way to weigh that factor in Penn Central. On the character of the government action, that goes back to whether or not the rule actually relates to a hydrogeologic purpose. If it doesn't, if it doesn't actually help prevent drawdown or subsidence or any of these other things for which they can regulate, then you have to weigh that against the uncontested fact that we have, you know, more than a million dollars at four million to nine million dollars in devaluation of our property based just on the implementation of the GPU rule. In your reply brief, you make some new points about how other districts are regulated. Did you present any evidence to support that in the district court? I believe we've made reference to the Mesquite groundwater district in the summary judgment phase and then in our appellant's brief. The Mesquite district has a GPU rule, but it doesn't, it's not exactly like the PGCU rule. Well, that's not my question. In your reply brief, you apparently raise new matters that you didn't present in your opening brief. The question is, did you present any evidence in district court in support of those claims? Just briefly, I don't believe that we made that specific argument at the district court, but it was based just on rules that are extant within the state to show that this argument of implied authority wasn't... You don't believe you made that argument or you didn't make that argument? We didn't make that specific argument. All right, thank you. All right, thank you, counsel. You've reserved your rebuttal time. We'll hear from, is it Trejo? Trejo, yes, your honor. Okay, I didn't want to butcher it. All right, thank you, ma'am. You're up. Good morning, your honors. It is a privilege and an honor to appear before this court. This case is fundamentally about the regulatory authority vested in groundwater districts by the Texas Legislature. Here are the North Plains Groundwater Conservation District and the Texas Panhandle. It involves the Idaho Corporation, BLF, now the largest potato farming operation in Texas, operating without regard to the regulations in place to protect the declining groundwater supplies of the Ogallala Aquifer and the district's decades-long effort to conserve that diminishing supply. BLF wants to have the district's production limitation rules struck so that it can maximize its pumping, and if this court won't do that, BLF has raised a number of meritless constitutional claims. For years and through the present, BLF has violated the district's groundwater production unit rules by pumping in excess of its annual allowable production under the rules. In the three years from 2021 to 2024, BLF overpumped more than 25,000 acre-feet or 8.3 billion gallons of groundwater in violation of the district's production rules, rules that all other permittees comply with. This suit was... Doesn't the limit apply 1.5 acre-feet per GPU and they were saying per acre they're producing something like 0.10 acre-feet, is that correct? Is there that disparity? I don't have, they don't have all their farm in production so I think that's a little bit of a manipulation of the math, but nevertheless what they're seeking to do is pump much, much, much, much more than 1.5 acre-feet per acre in parts of the property. In parts of the property? Right, so draw down and create a cone of depression in some parts of their property, and that's what the rules are designed for. Where do you have evidence to support that? That there's some sort of spatial overuse of the water in the reservoir? Where's your evidence? Well it's just the science on the Ogallala, so the Ogallala is a pretty uniform aquifer, so we get cones of depression within the aquifer that's sort of well studied and well researched and undisputed in the record below. And we know that there was testimony in the hearing on their variance request that neighbors were feeling impacts from their localized and basically violation of the district's rules and over pumping in parts of their property. The trial court here properly upheld the district's rules based on statutory construction, not on purported fact issues. The Texas Legislature has declared that groundwater conservation districts are the state's preferred method of groundwater management, and districts are to protect property rights, balance the conservation and development of groundwater to meet the needs of the state, and use the best available science in the conservation and development of groundwater through their rules. Districts are directed by Chapter 36 to manage and protect groundwater using the best available science in doing so. Ms. Trejo, we know the statutory background, it occupies about two pages printed out, but what I would specifically like to know is, how do you explain your unique, oh well, yes, unique use of 1,600 acre tracts within a landowner's more expansive ownership, and your 25,000 foot you know, corner to corner limit. How do you explain that in terms of E2, which requires a hydrogeological impact? Your Honor, what we know overall is that districts are authorized by Chapter 36 of the Water Code to manage production, and that they're authorized to do that, including by managing production from tracts of land, and also from acres assigned to a well site. That's what these rules do, so they create a management area within which the overall production can be no more than 1.5 acre feet per acre. The size limitations that the district developed, because they have some of the larger tracts in Texas, they're regulating some of the larger farms and expanses of land, and what they've determined over the years is that they need some management size in which they regulate that production, and that's authorized under Chapter 36 to do. The vertical corners prevents the tracts from being, creating, allowing basically wells to be super, super narrowly drilled and create increased cones of depression in a narrow area, so basically it was an experience thing. They're out there, they're farming, you know, the board is made up of farmers with lots of experience, and so we know that... I'm sorry, where's your testimony in the records to support all this? Well, it's about the rules and the background of the rules. There is actually testimony from Bob Zimmer, who's on the board, about the way that the rules were developed. Basically, they learned from experience that cones of depression were being created in parts of the district. So, why not, go ahead. No, I was just going to say that in terms of statutory construction, whether the rules are authorized, or whether, you know, whether they are authorized under the Water Code, it is undisputed. There are no facts in dispute that the rules have the effect of achieving the district's goal set forth by the Texas legislature. Well, you could have done that by a per acre limit, just like your neighboring GCDs in the Panhandle. So many of them don't... Well, that is an approach that would have been authorized as well, so both are authorized under the statutory authority, and there's no dispute that the rules have the effect of achieving a lowering of production. So, they reduce production from the aquifer, which is what the district is trying to conserve. Are there other potato producers within this GCD? I think there are very few... I think the answer is no. I'm not certain, but I don't think so. I understand there aren't... When did the district start regulating in terms of GPUs? The rules were first adopted in 2005, more than six years before this landowner purchased property, and when he purchased this property, when BLF, the company, purchased the property, they did an analysis of the amount of groundwater they would be able to produce under the GPU rules already in effect, and considered that in buying the farm. So, well known to the landowner that these rules were in effect, and that they would be limited to this amount of production. So, yes, the rules were on the books a long time before the production. So, you're saying... So, you're affirming to me that vis-a-vis the statute that says the district shall select a method appropriate based on hydrogeological conditions of the aquifer, and may limit amount of water produced on contiguous surface acreage, that you have hydrogeological evidence to support that? Yes, absolutely, Your Honor. The rules achieve the desired outcome. It's not... Any limit would achieve the purpose of not pumping more water. Any limit per acre or contiguous. So, why GPU? Where is that defended factually in the record? It's a management area within which the landowner has to limit production to 1.5 acre feet per acre, and there was testimony, and there was evidence in the record about the district's adoption. Is that cited in your brief? Where's the evidence? Yeah, we do cite to some of that in terms of there's some reference to Bob Zimmer and his testimony before the district that's in the appellate briefs, and it's in the summary judgment evidence as well. Is he a water expert? He is a groundwater district board member whose testimony just happened to be reflected in the record below. Essentially, the question before the court is whether the rules are authorized under the statute, and the statute authorizes production by track size. We believe that the district necessarily, at least since the Texas legislature and the Texas Supreme Court, have continued to express that groundwater conservation districts are the way that Texas protects groundwater for the future of all Texans. That districts have to make decisions based on localized conditions, and this district did just that. It's existed since 1955 and has developed a management approach that limits overall production, and it does so by creating management areas that don't change the landowner's property. They still have the exact same fee simple property that landowners purchase, but within a 1600 acre area that they choose, they select, they must keep their withdrawals to no more than an average of 1.5 acre feet per acre. And the 25,000 limitation provides a requirement that limits them from being too narrow of strips, but also provides them some flexibility to farm and move wells around as they see fit. And so we discussed in the briefing that landowners testified about needing some flexibility and that there was experience with farming in this district, that is how they developed their rules. You heard counsel's response to one of the questions, and he seemed to delineate that there is some dissonance between the expert reports to the extent that it made summary judgment inappropriate to wit that there are these fact issues that ought to be tried, et cetera. So what's your response to that and more to the point in the back that I think Judge Jones was asking you? Because in some measures, this sounds like a good trial. On the other hand, you're saying it's purely legal, so address why the fact matters are distilled as such and specifically address the sua sponte grant of summary judgment. So it's kind of a multi-part question, but I'd appreciate if you would respond. Thank you, Your Honor. Yes, it's really important to keep track of what the arguments are here in the first argument about ultravirus, which is the core of this case. There's sort of two pieces to it. It's an ultravirus argument that we don't want to comply with the rules, they're ultravirus. That's why they sought a variance from the rules, because they weren't complying with them and they didn't want to comply with them, even though everyone else in the district is doing that. So the first question is about statutory construction. Is what the district's rules, you know, what they do, the GP rules, are they consistent with Section 36.116 of the Water Code that authorizes production based on acreage and based on assigned number of acreage to a well site? And the answer is yes. There's no factual dispute that, that's a question of statutory construction. So that was a legal question for the court. And there's no factual dispute that the rules have a rational basis. The district provided a rational basis for the rules. They explained that it was a management tool within which to measure withdrawals so that there wouldn't be greater withdrawals in certain parts of property from others that were so disproportionate. Well, Ms. Trejo, let me, I'm sorry, I'm not going to take up all your time, but I do, page 11 of appellant's brief has a map. I'm showing it to you, has a map of GPUs, which I think are in their area. Is that right? Yes, I believe so, Your Honor. The technology doesn't really work for her to see it in the image, but it's okay. Page 11 of appellant's brief, and it's, has this very odd looking, it looks like something from a video game of how the tracts had to be constructed, consistent, in part consistent with your, this supposed rational basis. Is that, is that a, I mean, you didn't challenge that depiction, did you? No, and I want to be clear, that's how this landowner chose to create its tracts. The district did not manage the, mandate those sizes and shapes. This landowner determined that it would be most advantageous to the landowner to put wells in these locations. So they were using the flexibility that the rules provide to create even bizarre shapes for their GPUs. Their land stays the same, the feed title stays the same, but they decided they could get the most pumping if they delineated that way. And the district provides that flexibility to landowners. So the, the question about the takings claim, I want to kind of quickly go to that. There was no genuine issue of material fact that precluded the district court from answering what is a question of law, whether a taking had occurred in the negative. The district court correctly applied the law to the facts to determine that the district's rules managing groundwater production did not constitute a taking under federal or state law. And the facts of this case do not support BLF's asserted per se takings claim under the Texas Constitution based on the 1944 Mars case. First note that BLF makes no argument that it suffered a per se physical invasion of its property or a per se regulatory taking under Lucas due to complete deprivation of all economically beneficial uses of its property as the district has not occupied its property, which BLF continues to farm at a profit. The Mars case is inapplicable for several reasons. It only applied in the oil, has only ever been applied in the oil and gas context. And it stands for the proposition that the Texas Supreme Court will strike down orders that are not supported by substantial evidence or are arbitrary, unreasonable or confiscate property and thus do not adequately protect a mineral interest owner's fair share to recover oil and gas specifically. BLF's per se takings claims for damages must be read in the alternative to its ultra virus claim challenging the GPU rules because courts assume for a takings claim that the underlying governmental action was lawful and decide whether the governmental action resulted in a taking for which compensation is due. Indeed, the only remedy available to BLF for its alleged per se takings claim is compensation, not invalidation of the district's rules. Long, and this is important, long after the Mars case, the Texas legislature differentiated the regulatory frameworks applicable to groundwater from oil and gas. Section 36.002 of the Texas Water Code provides that landowners must obtain permits to withdraw groundwater from groundwater conservation districts who are to adopt rules determining groundwater production allocations. And unlike the requirements for oil and gas extraction reviewed under Mars, landowners have rights to drill for and produce groundwater, but not to capture a specific amount of groundwater below the surface of that landowner's land. Mars speaks to a distinct regulatory context, and the undisputed facts here differ vastly from Mars. And even if Mars could provide a cause of action related to groundwater, those facts make clear that BLF has no claim under Mars. Under the Railroad Commission proration orders, nothing, unlike them, nothing within the district's rules limits BLF from establishing GPUs and drilling wells within each of its GPUs and producing up to 1.5 acre feet of water per acre within each GPU over its entire property. But BLF has not established GPUs over its entire property because some parts of its property do not have much available groundwater beneath it. As the trial court noted, BLF provided no evidence that its property was being drained, unlike Mars. Indeed, if any drainage is occurring, it is by BLF of its neighbor's property as only BLF is over pumping its production amount. Even assuming arguendo that Mars applies as BLF urges, BLF is not seeking to recover a fair share of groundwater beneath its property, but rather hopes to continue pumping well in excess of established limits and within select portions of its property. While making no... Mr. Aho, are you not going to say a word about Penn Central? Yes, let's go to Penn Central. Sure. So, turning to Penn Central, the trial court properly granted summary judgment as a matter of law after weighing all of the Penn Central factors. Governmental regulation is so onerous that its effect is tantamount to complete ouster from property. Then a regulatory taking... Let me, since you have limited time, my concern is what he mentioned earlier, which is there is no per se 42.5% limit on Penn Central. And obviously in the Day case, yes. So, you agree that the district court was wrong about that. Don't agree about that, but let me be clear what I do agree about. You're right. There isn't a per se taking on that basis. But that's not what the district... Four to nine million dollars isn't significant enough to at least inquire further and have a trial? No, not in this case, Your Honor. To be clear first, the district nor the district court were doing a bright line test on any of the factors, economic impact, extent of interference with reasonable investment expectations, or character of the governmental action. But Judge Kaczmarek correctly found here that BLF's case is so far out of line with what has ever been considered by any court to be a taking that summary judgment was proper. BLF offers up a straw man asserting that the district court and that the district are picking any one of the Penn Central factors as determinative of whether a taking occurred. Instead, the district contends that on the legal question of whether or not a taking occurred, the lower court properly evaluated all controlling factors under Penn Central to find no taking. With respect... What's your best, pardon me, what's your best case for saying that a summary judgment was required when millions of dollars of productive use of the property are being interfered with? Well, first... Percentage aside. First... Hang on one second. Madam Clerk, give counsel an additional two minutes on the clock so she can completely answer the court. We're not rushed. We've got time. That's fine. Put an additional two minutes on the clock for her, and counsel on the other side can have it if necessary to deal. We won't speed through. Got a lot going on. All right. So you got time. So slow your roll and fully answer the question Judge Jones put to you. Your Honor, thank you for the question. I think it is really important to keep in mind that determining whether or not a taking occurred under Penn Central is a legal question. This is not a factual dispute. We have no facts in dispute. The number that you mentioned on decline in value is best case scenario, assuming the expert witness from the defendant is correct, that there's at most a 9% decrease in value. We don't concede that that's the amount. It's far less. In fact, we actually know that the BLF here had an appraisal done, considering the amount of value that it would have and the ability to farm its property under the rules that were already in effect at the time, and baked that into the purchase price. So the actual purchase price reflected the knowledge and literally interpretation of what the impact of these rules would be on this landowner's purchase. So we know that about impact. It really is baked into the purchase price. But with respect to there's a very, very small percent of, at best case, taking all arguments in favor of BLF, that there's a very small, well under 10% percent of decrease in value. But then we look at the other Penn Central factors. We know that under the extent of interference with reasonable investment backed expectations, that in fact, as I just discussed, this landowner knew what the rules were, considered what the impact of the rules would be in farming, and purchased the property with that knowledge, with that understanding, with that economic impact baked into the purchase, which, as Justice O'Connor discusses, is an important part of figuring out what is reasonable and unreasonable. And then with respect to the character of the governmental action, this district is working very hard to protect the Ogallala for the future of Texans in the Panhandle. The existence of groundwater is an existential threat for the state of Texas and particularly for the Panhandle region. It is charged by the Texas legislature, as recognized by the Texas Supreme Court, with the important obligation to conserve and protect this for the children and grandchildren of the Texas Panhandle. It's undisputed. There are no facts in dispute that the rules have that effect. They limit production. So you're very skilled at maximizing a sentence without any breaks or pauses, but I'm going to stop you there with the time. But we appreciate your argument. We'll shift back to Mr. Jones for rebuttal. All right, you're up, sir. I just want to point out a couple of things from counsel's presentation. First, on the takings claim, there was some discussion about whether or not there was evidence of an invasion of our property. Now, under MARS, the court said that the taking occurred because you have a pressure sink disparity, proration orders required the plaintiff to shut down their wells, and it allowed oil molecules to travel to their neighboring properties. The district court found, in this case, that we didn't put on any evidence of a pressure sink disparity. However, we did. Thornhill, in his affidavit, which begins at record 2567, discusses the pressure sink disparity. He discusses it in his deposition testimony that begins at 1522, as well as there's a discussion in the variance hearing. And the point in the record there is like 2399 to 2418, but that's going to be towards the end of that section, where he's talking to a man named Travis Taylor, and he says to Travis Taylor that under the principles of hydrology, they're draining one another because they're neighbors. Now, the day case does say that there's no cause of action for, quote, ordinary drainers. That's not what's defined. However, if you look at a regulation that requires somebody to shut down one GPU because it produced too much water, then that well is no longer going to be forming its own pressure sink. And any neighboring wells that abut that GPU would then be taking molecules away from the GPU that was shut down to comply with the rules. And that's where we get this evidence of a taking. There's some discussion about the legal issues attendant to Penn Central. Now, while Penn Central does basically make a legal test, there are fact issues that can be debated within there. One, the severity of the economic harm. We have competing summary judgment evidence there. Now, it's $4 million to $9 million, and I'd imagine that they're going to say and did say that that amount is not enough to trigger Penn Central. However, if you look at the Texas Supreme Court's opinion in Dey and the San Antonio court's opinion in Bragg, both looking at the groundwater estate, they found an 11% increase in irrigation costs. So not even fair market value, just irrigation cost was sufficient to survive summary judgment. And then a nebulous finding in Dey of the effect that increased irrigation costs and grazing costs were enough to survive summary judgment. So on those points, we do think that we put up sufficient evidence to go forward on our takings claim. I'd also like to point out that regardless how laudable the goal of a regulation is, that doesn't touch the character of the government action. The court taught us in Lingle that if a regulation doesn't actually meet its purpose and it doesn't have a rational relationship to a government objective, then that's a substantive due process issue, not a takings issue. So what you're looking at in the character of the government action is more about the impact that the regulation has. So what's the cut line you want from the panel? You want us to just flip this and send you back for a trial? You don't want us to rule on any of those big ticket issues, right? The only big ticket issue I believe that would be something the court could rule on is a matter of law.  We're not venturing into could. I'm asking you, what is the express relief you're seeking? I'm not saying you're getting it. I'm just asking you, what is it you're reading? Well, we heard what you said. We read the briefs. But I'm asked to the cut. What is it? Is it you, Judge Casimiro, should have given you a trial. You want us to short form, go back, have a trial? Is that what you want? The court today should rule that the GPU rule is ultraviolence. And that would effectively end the case. So you want us, your argument to us is that summary judgment was inappropriately entered. But while you're here, you want us to make a plenary determination as a matter of law and skip all that and just totally end the case. That's what you're saying? Well, that would be great. But as a practical matter, I know it's going to be sent back to the court. Well, I'm not putting words in your mouth. I get to ask you the question. That's why I'm asking. People come here all the time. And it's not easy to know exactly what they do want. It's clear they lost. What I'm saying is to cut in, you just want a trial so all the experts can say what they can say. There's a ruling, et cetera, et cetera. Or whether you are sort of over the top and sort of back to what Judge Barksdale, you have some arguments in your reply brief. It's not clear that all that was presented. So why should we give you an off-the-top ruling? My real question is that. Is that what you're seeking? Yes, we are seeking the invalidation of the GPU rule. OK. But in your conclusions and for prayer, you never say you should rule on the law. It's ultraviolet. You just say remand for a trial, full trial. And it should be remanded for a trial because we ought to have a trial that is on the merits. So it's inconsistent with what you're asking for now. Well, as I think through it, the only pure question of law is whether or not the statutory authority exists for the GPU rule. That would be something that, had we briefed and asked for it in our prayer, that the court could have remanded or could have ruled on. However, I think that's a good question. Wouldn't theoretically there be the reason you were asking for remand on ultraviruses that theoretically there may be? Well, there is a difference of opinion as to whether the GPU regulation complies with this section E1, whether it is appropriate based on whether it's any foundation in the hydrogeological conditions. That's correct, Your Honor. Yeah, when I conceptualize the ultravirus argument, there's those two parts. One's the statutory authority. The other is whether or not there's a statutory fit. And that statutory fit question is subject to fact issues. Would there be a basis to certify this to the Texas Supreme Court? I don't believe so. The Texas Supreme Court wouldn't be ruling on anything unique or trotting any new ground in such a request. All right, thank you, sir. You have the red light. We appreciate your briefing and argument. Counsel, opposite. Likewise, there's a lot going on in this case. But we'll read it all, and we'll get it decided with alacrity. All right, thank you. All right, second case for the morning.